We have four cases on the calendar this morning, one from the Board of Contract Appeals, one from the Patent Office, two government employee cases from the Merit Systems Protection Board, one of which is not being argued and is being submitted only on the briefs. First case is Justman Freight Lines v. US Postal Service, 2015-1373. Mr. Hendel. Good morning, Your Honor. My name is David Hendel, representing Justman Freight Lines. The question before you is whether Amendment 5 unambiguously expresses an intention to resolve all aspects of the remediation of the Atlanta route and to ban any possible future claims related to it. That's the question before you. The change order, negotiated service change, does have the utility of being extremely brief. There are very few words in it. Is that a utility or a disutility? Well, in the circumstances of what the parties were doing at the time, it was a utility. It invokes the changes clause. Now, it's a bilateral agreement, correct? So you concede that fact? Well, we've always conceded it. Now, it's a fully drafted postal service, but it's fine. It was signed by both parties, yes. Okay, and why didn't you negotiate at the time for additional costs? Well, it would have been nice if that had been done, but it makes a lot of sense actually not to. Why? Justman sent a letter before this. Justman sent a letter saying, hey, I'm going to have this excess equipment. Would you consider allowing me to use it on the summer route? That was pending. He had not received a response to it. So this was an open item. Why wouldn't you then at least have some language reserving that issue for a later discussion? That would have been nice. And the same question could be, why wasn't there a release? Postal service intended this to be released. That was out there and everybody knew it. It's very common, by the way, to have these pre-modification notifications of costs that are out there that are not later discussed. That's very common in these cases, and that does not react to some kind of a hidden release if it's not negotiated or not mentioned. Is there anything in the contract that allows for later adjustments after something other than a minor change? The changes goals. I mean, Homer Beadle. I think you're referring to the argument that the government is saying is that, look, you've got to get it all in there right now. And if it's not in there, then that's it. You're done. I think that's exactly the argument. Well, with respect to the minor changes, it's very clear that with a unilateral change, there is a right to request additional compensation. There is a right to make claims. With respect to the non-minor change, those same provisions don't apply, correct? Well, that's a misunderstanding. First of all, the reason why it's worded that way is to help the contractor. Because a lot of the posters have $10,000 in these contracts, mostly from mom-and-pop companies. And therefore, to prevent some companies don't want big changes. That's why the posters can make unilateral changes at $5,000 for relatively small. Anything over that requires the contractor to agree. Right. And that's the government's argument. That's exactly what happened here, right? In Homer Beatle, there was a clause, the same type of clause, except it expressly said, for any major service change, there has to be agreement on price before that can even happen. Except that. And in the Homer Beatle case, what happened was there wasn't that. There was a change order. There was an issue. There was no difference in price. Later, the contractor came back and said, wow, this really increased my effort. I wanted increase. And the posters raised the same argument that I guess is vague now. And actually could rely on a contract clause that said you have to have agreement. Well, the board said, no, you should have done that. But not having done it does not preclude recovery. And that's when you have much stronger language than you have today. So that argument has been resolved 40 years ago, when there actually was a provision that says what the government is trying to imply now. What we have in front of you is a modification. It has no notification. It's a release. It's a finality. It's a settlement. It's a moving forward document done briefly to advance what has to be done to get a new price and to deal with anything we have to deal with later. You said earlier when you got up, something about the test, the question before us was whether the language was clearly unambiguous. Where is that? Where do I find that? Because I was looking at the elements for accord and satisfaction. And so I'm not sure where you're getting that as being the standard that we're supposed to apply. Well, the Bell BCI case, I suppose, the board here said we find plain language is unambiguous. And that's the Bell BCI kind of theory. And so if you find it's ambiguous, you've got to go further. Now, in summary judgment, it would have been inappropriate here. What's interesting is the board did say they were relying on the plain language. But they didn't mention the plain language. It's very surprising, isn't it, to say that, well, we're relying on the plain language. The majority, I should say, the dissent didn't. The dissent actually looked at the plain language. The majority relies on three things. Number one, it says, look, you should have objected. You knew you had these calls. You knew you might have. By the way, you might not have. And that was the big hope at the time, that we're probably not even going to have these calls. But you knew you might have had it. You should have done something. Well, that argument is rejected all the time. That was rejected in Chantilly. It was rejected in BD Electric. It's rejected. That argument doesn't work. Plus, it's not an interpretation of what's in front of you. It's not an interpretation of what the parties agreed to. Yes, it would have been so much better if some of these parties had written this differently. You've got to play with the card you have. So that's not an interpretation argument. All right. Let's look at the other two things. The majority relied on three. They said, well, there's two pieces of extrinsic evidence that support our plain language conclusion. The first thing was a letter that Juspin Sentiment talked about a little bit, saying, hey, I'm going to have this excess equipment. You know, can I use it on this other country? At the time this modification was issued, and it had to be issued because the contract was already taking place, there had to be a new price set for that going forward work. At that time, everybody knew it's possible these costs might materialize. Maybe they don't. So it was out in the open. That doesn't change anything in terms of Juspin's position or the Pulsar's position. And that was the exact same case that you have in Chantilly, Beater, Litchwick, that same type of provision, or same type of scenario. The third thing that the majority relied on was an e-mail from the transportation specialist saying something like, this takes into account the adjustment of the vehicles. Now, first, put that in context. One, he had previously sent a draft of the change order that was incorrect, that didn't take out enough vehicles. So he sends them another draft saying, oh, this corrects that, this changes that. Second of all, everything in his e-mail is consistent with our theory. Of course, you should have to take out the vehicles for the going forward price, which is how Juspin interpreted it, how the dissent interprets it. For the going forward price, of course you have to take out the vehicles. He did testify in his deposition that he put nothing in for idle equipment costs. And the dissent makes the note that when you have a change order that has a price adjustment and no release language, that's supposed to be interpreted very narrowly. And they cited the advanced business concepts case for that proposition. This was an emergency contract that was for a temporary period of time, correct? Well, it started that way. That's how it first started. By the time of the elimination of the Atlanta route, it had been made into a permanent part of the existing contract. So it was no longer emergency work. But the Atlanta route was on its own a stand-alone emergency contract, and then it was kind of put into this main contract. We're talking about a six-month period of time here? Something like that, yes. As you can see, a price adjustment like this is not a good way to reimburse for idle equipment costs, because changes are always happening. In fact, in this case, six weeks, two months after this was negotiated, there was a change, and there was another price set for other work, and things are changing pretty frequently at the Postal Service in terms of transportation. And so therefore, what the contractor is asking for here, basically idle equipment costs, costs made idle because the Postal Service was wanting to save money and reduce it. In fact, it did save a lot of money from this. Those costs were lump-sum costs. They had nothing to do with the going-forward aspect, and it wouldn't even have been appropriate to put it in a going-forward price, because that's getting changed all the time. Unless there's anything further, I'll save the rest of my time. We will do that, Mr. Handel. Mr. Singley? May it please the Court, Amendment 5 was an unambiguous bilateral contract modification that means what it says. The changes clause in this fixed-price contract provides no basis for Justman to recover the additional compensation that they seek today. Let's begin by looking at the actual... Let me ask you, why wasn't the dissent correct in that, at minimum, this isn't something that can be established on summary judgment when you're talking about whether there was a meeting of the minds? Your Honor, there's one sentence in the dissent's opinion where the dissent chose the wrong direction, and that's where the dissent decides that the contract was ambiguous because there's no mention of a claim. But there's no right to a claim in the first place under this contract. There's no right for them to recover the costs that they're seeking here because the changes clause that this modification cites to does not provide that right. So it makes perfect sense that the modification wouldn't include that claim. And that's the only basis that the dissent relied on to go down the road of looking into extrinsic evidence and considering the contract ambiguous. And this Court has consistently held that silence is not enough to create an ambiguity. In the McAbee case, the contract was silent about a height restriction. That was a case where the parties agreed that the Army Corps of Engineers could deposit waste on an easement, and the contractor came back later and said, hey, you put too much waste here. You went above a certain height that was reasonable. Well, the contract didn't say anything about that. The lower court tried to create an ambiguity and say that that was an ambiguous term. So you have a situation in which, for minor changes, you have the ability to make claims or request adjustment, but here we have a major change and they can't do anything about it? Your Honor, it's not leaving them. That's not correct to say that they can't do anything about it. It's a fully negotiated bilateral modification. So they have two options. They can turn down the change. They can say we're not willing to sign this bilateral modification. That puts the ball back on the Postal Service's side, and the Postal Service has two options. They can either not make the change or they can terminate. But as a practical matter, you're putting them in a very difficult posture because if they don't agree to go along with you, then they are putting at risk their ability to possibly get the alternative route, and they're putting at risk the rest of the route that they already have. So they're putting the whole contract at risk. No, Your Honor, they're not putting the rest of the contract at risk. And I wanted to clarify because you asked. Why not? Because it says the Postal Service can terminate in whole or in part. So the Postal Service can partially terminate just that route. Right, but there's no requirement that it be partial. It could have been complete. That's correct. So the parties agreed in 2007. Again, this all falls under that contract, and you had asked if this was an emergency contract. I just wanted to clarify. They had an emergency contract, but that was terminated, and then it was wrapped into this contract that was signed in 2007. And so the parties at that time agreed that they would have a termination for notice, the termination with notice clause applied. So either party has the right without cost, is what that clause says, without cost to terminate part or all of this contract with 60 days of notice. So they agreed in 2007 that that was how this would work. And the reason that the parties agreed to this was so that they could have a general contract that they didn't have to constantly renegotiate, where they could add and subtract routes. And all they did in this case was subtract a route. And the reason I cited to McAbee is because they tried to create an equity argument or they tried to create an ambiguity because the government piled too much waste on that easement. And that's essentially what they're arguing here. Hey, this was a big change. Well, that's exactly what the contract said. There was no limit in the contract for the size of the changes that could be made. All it said was that routes will be added or subtracted in this manner. And the parties agreed to that in 2007. And the government did exactly what it agreed to do when it made this modification. It was the same way that it made modifications four times prior and then afterwards when it made two more modifications to the same contract. Mr. Hendel cited a number of cases for the proposition that he didn't have to include a reserve clause or anything like that to reserve the rights. What do you think of those cases? First of all, they're not controlling here. The cases that he's citing to are Postal Service Board of Contract Appeals cases. He did cite, he did refer to one Fed Circuit case, I think, from the dissent opinion in the board's opinion. But those cases are not applicable here. But there's an important distinction that needs to be made generally is that this is not the same as a typical government contract. It's a fixed-price contract, for one thing. So we're not talking about, you don't get costs. It's a fixed-price contract, so the Postal Service is ordering trucking services. And they're not basing, the contractor doesn't come back for costs later. A lot of the cases that are cited in the briefs are construction cases. And the reason we made the distinction that we did between JARA, Chantilly, and the other, it's not coming to mind right now, the other board case, was that those were construction cases where the government can make a change to the contract and say, hey, now we have more money, we're going to add a fourth floor to this building that you're currently building. The contractor has no choice but to continue with that construction contract. And those cases have an actual right, they have an express right, for the contractor to then come back and say, this is how much more it costs me to do that. And so this is not that type of case. When you say a lot of them, are you saying all of them? Or are you saying, I mean, how do you distinguish the Beadle case? The Beadle case, first of all, the Beadle case is completely different from what we have here. It's nothing like this case. The appellant sought payment for services that had already ordered and performed. And the parties didn't realize for two and a half years that this guy had been doing many more miles than he thought that he was supposed to do, or he had been doing more miles than he had agreed to in the contract. And so the question in that case was, how do we compensate this guy for work that he has already performed and not been paid for it? He had just been receiving shorts for two and a half years. And so factually it's totally different. But the board didn't say, so we're going to pay him on equitable grounds. The board said that the contract didn't contemplate. Actually, the board found that the government had breached the contract in that case. There's no breach in this case. The government has never breached any of the promises that it made in 2007 when the parties agreed that this is how they were going to change the contract by adding and subtracting routes. The Homer Beadle case, and it's not controlling because it's a board case. So factually it's totally distinguishable. The contract was breached. And then as far as when we just make these general, I mean the opposing counsel made some kind of general comments that normally in these types of cases the contractor is able to come back. That's imprecise. The cases where that happens, it's because there's an express right to do that in the contract that's being referenced. I think in the briefing there was some suggestion that this language in this contract is unusual. Can you explain that? Your Honor, I mean part of the reason that it's unusual is because typically when you're discussing government contracts you're discussing standard FAR clause provisions, and those provisions don't apply to the Postal Service. The Postal Service has its own contracting system. There's a website that has all the clauses that are referenced in the contract as you look through the contract that we submitted. I mean there's many points where it cites to specific contract clauses. Normally in a FAR contract those clauses are all in Section 52, the Federal Acquisition Regulation. You can go to that and look at it. That's not what we're talking about here. It's a different kind of contract. And so the rules that apply... Is it a different kind of contract from all others that the Postal Service has used, or is it a different kind of contract than normal government contracts? I'm not sure I understand what your point is. The only distinction I'm making, Your Honor, is that, I mean the main distinction that needs to be made here is that the changes clause in this contract does not provide a mechanism for the plaintiff to come back after it negotiates a bilateral amendment and ask for additional money. That's not a right that's provided in the contract that they agreed to in 2007. So they're trying to find rights that aren't in there, and so that's the only reason I'm... And they're doing that by referring to cases that relied on different contract clauses. But had the government done a partial termination, I mean this seems like more than just a change. You're actually terminating an entire portion of the route. It's just a matter of language. If we'd called this a partial termination, they would have the right to compensation. Your Honor, it is a matter of language, and you have to be very careful about what language you're using. This is not a termination. They did not terminate this contract. They removed a route. But isn't it a partial termination? It's not, Your Honor. It says that this route is being eliminated pursuant to the changes clause. At the very top of that modification, it says what the rules of this change are going to be. But I'm saying that the Postal Service could have just as easily accomplished the same thing through a partial termination, could it not? That's correct, Your Honor. They could have. And then they would have had the right to come back and seek compensation. No, they wouldn't, Your Honor. Then you have to go to the termination clause and see what the termination clause provides. The termination clause provides that if they couldn't agree and they decided to terminate that particular route, or the entire contract, which they didn't do, they would have gotten 60 days of payment. They would have gotten 60 days notice. So they would have continued to perform or not. It's up to the party to decide. But that termination clause kicks in, and it defines their rights, and they have limited rights. But those are the rights that they agreed to when they signed the contract in 2007. That's what the parties set up when they built this contract and signed it. One thing that Justman points out in response to the argument about the new rate per mile somehow providing them, compensating them for the change, they point out that they were paid on an annual contract basis. So what's your position on that? Do you think that there was any intent at all to compensate them for the idle costs? Again, Your Honor, this is where you have to be very careful about the extent and why you're considering extraneous information. This is not an ambiguous modification, and so this court does not consider extrinsic evidence unless it makes a determination that the contract is ambiguous. This is not an ambiguous contract, and it's not an ambiguous modification. But the board majority actually did look at extrinsic evidence, did it not? Your Honor, the board looked at extrinsic evidence in the same way that the case that it cited to looked at extrinsic evidence, and that was Coast Federal. And in that case, the extrinsic evidence did not affect the outcome of the case at all. The contract was not ambiguous. The court was careful to say that, and it said extrinsic evidence had no bearing on the outcome. Although we need not consider the extrinsic evidence to interpret this unambiguous agreement, we note that much of it is consistent with the agreement's plain meaning. So all they did was note that the evidence was consistent. And so the majority did the exact same thing in the majority's opinion, simply pointing out that, hey, if we did examine extrinsic evidence, if it did come to that, these are the facts that would be fatal to Justin's case anyway. But to answer Judge Stoll's question about the consideration, I mean, based on the document itself, it shows that the rate went up. The prior, there was a wage adjustment. How is that relevant if they're paid on an annual basis? Well, Your Honor, they're paid by the mile. So they're paid by the mile. I mean, this is a trucking contract, so they get paid at a certain rate per mile, and the rate per mile went up, and if you calculate it out on an annual basis, it went up $47,000, I mean, over the course of a year. What about their argument that that's just a formal calculation or that's just a calculation that would have occurred even without the change? First of all, Your Honor, that relies on extrinsic evidence, which is not required here because it's an unambiguous contract. But, I mean, if you're going to look at extrinsic evidence, there was evidence before the board that that's not the Postal Service position, that the contracting officer considered this to be an increase in rate and he considered it to be related to the fact that they were losing a large route. But, again, that's not relevant to the outcome of this case, and I'm not exactly sure how they believe that to be true to begin with. But, again, based on the plain language of the four corners of this document, you're looking at a significant increase in the amount that they're being paid, and that's sufficient for consideration for the purposes of this case. The other thing I'll say, as to the meaning of the mines, if it did come to the meaning of the mines, Texas Instruments and Holland make it very clear that this court is to look at the totality of the circumstances and were to look at whether there are accompanying expressions sufficient to make the claimant understand or to make it unreasonable for him not to understand that the performance is offered in full satisfaction. In this case, based on the contract, the base contract that this amendment was based on, it's completely unreasonable for Adjustment to think that they can come back later and get additional costs. This is a fixed-price contract, and they agreed to this change. The contract provides no mechanism for the type of extra money that they're now coming back and asking for today. Thank you, Your Honor. Thank you, Mr. Singley. Mr. Hendel has a little rebuttal time. I do have to correct one statement Mr. Singley made, that absolutely we're not paid by mile. Any postal officials in the back room would agree with that. There is a rate per mile. That's for the convenience of the parties if there are extra trips and they want to use that in terms of pricing an extra trip. They're absolutely not paid per mile. They're paid an annual price. There's no question about that. Look at the payment clause, look at Joint Appendix 67. It'll tell you it's an annual rate contract. No question about that whatsoever. It might explain why the government thinks what it does about this case. This very short change order is only ambiguous if you interpret it to be an end-all. As it's written, it is completely consistent. It doesn't have to be changed one word to interpret it the way Justman does, as just setting the going-forward price. What authority do we have to get more money? What authority is there to reimburse them for those idle equipment costs? The amendment itself is the authority. There is unfinished business in there. That's the authority. But if you want more authority, you can find it too. In Joint Appendix 67 and 77, there's language that there's an adjustments compensation clause on Joint Appendix 77. In 2.1, there's language that allows the contracting officers to make adjustments in a situation like that. So there's plenty of authority in the contract to do it. The interpretation offered by the government as to why the changes clause would kind of hamstring the postal service would create a terrible policy. It would basically say, look, there's a change that needs to be done. Both parties are willing to do it. But for whatever reason, they can't agree as to what the price should be. And in that situation, if that comes up, which comes up all the time, and in that situation, here are your options. You must either agree to a price, which they said they can't agree on, or you must terminate the contract, or postal service can't do the change it wants. That's absurd. That's an absurd result. And no one would intend that. And if that's the intended result, you know what? You've got to say it in the contract clause. No court would ever impose that kind of absurdity. And if you look at what this court did in the Keter case, it is interpreting the changes clause that are in these types of contracts to protect the contractor, not to rip off the contractor. And with that, I urge you to reverse the decision, agree with the dissent, and bring some justice for Justin's great rights. Thank you. Thank you, Mr. Hindell. We'll take the case under advisement.